UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| MARY DAVIS, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>BOARD OF EDUCATION OF PEORIA )<br>SCHOOL DISTRICT NO. 150, a body corporate )<br>and politic, )<br>)<br>Defendants. ) | Case No. 12-1051 |

## ORDER

Now before the Court is the Motion for Summary Judgment filed by the Board of Education of Peoria School District No. 150 (the "Board") arguing that summary judgment in their favor is appropriate. For the reasons stated herein, the Motion [18] is DENIED.

### Procedural Background

Mary Davis ("Davis") was on administrative leave from her position as Academic Officer with Peoria School District 150 on June 7, 2010, when the Board adopted a Resolution seeking to dismiss her employment. Davis requested an administrative hearing pursuant to § 24-12 of the School Code, 105 ILCS 5/24-12, arguing that she had been deprived of an adequate pre-deprivation hearing in violation of the Due Process Clause. The Hearing Officer determined that Davis had received all the process that she was due. On December 3, 2010, she filed a Charge of Discrimination with the Illinois Department of Human Rights. The Charge was ultimately dismissed.

In the meantime, Davis was criminally charged with 16 felonies: eight counts of theft and eight counts of official misconduct. On February 21, 2012, Davis pled guilty to attempted

obstruction of justice, a Class A misdemeanor, and all other charges were dismissed as part of her plea agreement.

Davis' Complaint was filed in February 2012, alleging reverse racial discrimination in violation of Title VII and the Equal Protection Clause of the 14th Amendment.[1] In August 2012, an administrative hearing was held to adjudicate the propriety of the Board's request to discharge Davis, and she received a ruling in her favor. The Board sought administrative review in the Circuit Court of Peoria County, resulting in a reversal of the hearing officer's decision and finding cause for the dismissal. This federal action was stayed while Davis pursued an appeal to the Illinois Appellate Court. The Illinois Appellate Court affirmed the decision in favor of the Board, and her Petition for Leave to Appeal to the Illinois Supreme Court was denied. Briefing commenced on Defendant's Motion for Summary Judgment. The matter is now fully briefed, and this Order follows.

### Identification of the Parties and Overview of Undisputed Facts

Davis was hired by District 150 as a teacher at Richwoods High School in August 1985. In 1999, she was elevated to the position of Dean of Students, followed by a promotion to Principal of Lindbergh Middle School in June 2003. Davis became the District's Academic Officer on July 1, 2008, making her the third-highest ranking official in District 150. In this capacity, she was supervised by Dr. Herschel Hannah and Superintendent Ken Hinton ("Hinton"), both of whom are African-Americans. She is Caucasian and has a Ph.D.

During her time as Principal of Lindbergh, Davis was responsible for direct oversight of the Lindbergh student activity fund. Student activity funds are comprised of money earned or collected by student groups with a faculty sponsor and are reserved solely for student groups,

---

[1] Initially, Davis also alleged retaliation in violation of Title VII and her rights under the First Amendment, as well as that she was denied procedural due process in her termination. She has since withdrawn these claims.

extracurricular programs, and for the school. 105 ILCS 5/10-20.19(3). She was the only individual in the District who could withdraw money from the account or approve purchases, and it was also her responsibility to maintain the accounting records for the fund.

On July 3, 2006, Davis purchased a Mont Blanc 100th Anniversary Starwalker Pen for $467.75 using a Sam's Club Discover Card that she held in both her and the school's name for purchases; this was not a District credit card and was used for both personal purchases and items for the school. Around the same time, she purchased books on Amazon.com for $39.83. Davis then paid $507.58 to Discover – representing the combined cost of the books and pen – using a Lindbergh school check, number 1780, dated July 7, 2006. On the Request for Funds form required to disburse money from the fund, Davis indicated that the purchase was for "office supplies and books" and charged the total amount to the "7th grade Trip." The Request was then approved by Davis herself.

Davis maintains that there were no guidelines or policies provided to her relating to the administration of the activity fund. The activity fund accounts were periodically reviewed by Clifton Gunderson and the District's Director of Internal Audits, Michael McKenzie ("McKenzie").

In fall 2008, Julie McArdle ("McArdle"), a Caucasian, succeeded Davis as principal at Lindbergh. Parents began complaining about McArdle to Davis, Hinton, and the Board shortly thereafter. Throughout the fall, Davis communicated with McArdle about her performance issues, and in January 2009, Davis put McArdle on a remediation plan that outlined areas for improvement. When McArdle's performance failed to improve, Hinton held a meeting on April 21, 2009, to discuss the situation. Davis recommended that McArdle be dismissed. Hinton made the decision to dismiss McArdle because she was not a good fit for Lindbergh, and the

school was declining as a result. The same day, Thomas Broderick ("Broderick"), District Human Resources Director, phoned McArdle to discuss the early termination of her contract. On April 23, 2009, McArdle emailed Broderick a letter alleging that Davis had engaged in misconduct during her time as principal at Lindbergh, including mismanaging the student activity fund, stealing money from the fund, and the use of a Discover card in her name but paid for by the school. Broderick forwarded the email to Hinton and others. Hinton asked McKenzie to review the student activity funds at Lindbergh. McKenzie was able to find certain records, including the 2006 Discover card statements and application but was initially unable to locate the activity fund records from 2007-08.

On April 24, 2009, Hinton referred McArdle's allegations to the Peoria Police Department ("PPD") and also notified them of the missing activity fund records. McArdle personally visited the PPD in person to report her allegations. On April 27, 2009, the Board held a closed session and voted to dismiss McArdle's contract effective June 30, 2009. Davis was present and explained McArdle's deficiencies prior to the vote. After Davis was excused from the closed session, the Board was informed of McArdle's allegations against Davis and that a police report had been filed.

The 2007-08 records were subsequently located, having been moved due to a construction project. After reviewing the records, McKenzie reported to Hinton that he found nothing out of line. The Clifton Gunderson review of the 2007-08 records also noted no irregularities.

Detective Martin Kenser was assigned to investigate McArdle's complaint. He interviewed Davis on June 18, 2009, and August 13, 2009. During the first interview, it is undisputed that Davis denied having used school funds for personal reasons. Whether she was

4

also asked about the Mont Blanc pen at that time is disputed; Davis maintains that she was not asked about the pen during this interview, while Detective Kenser insists that she was asked and responded that the pen was a personal charge. During the second interview, Davis admitted that she purchased the pen with school funds. Detective Kenser also asked whether she had used the pen for her own personal use. Davis states that she responded that she was willing to take a polygraph examination; Detective Kenser asserts that Davis told him that she thought she had reimbursed the District for the pen but could not remember how or when she paid it back and that she could not prove it.

Hinton met with Davis and others on September 8, 2009, to discuss the allegations of misconduct. Davis was advised that Detective Kenser was going to turn his investigation over to the State's Attorney's Office. Hinton further stated that Davis was being placed on paid suspension pending the outcome of the State's Attorney's investigation.[2] Later that day, Hinton informed the Board of Davis' suspension in a closed session. Hinton left the District in December 2009 while Davis was on administrative leave. Dave Barnwell ("Barnwell"), a Caucasian, retired administrator, replaced Davis as interim Academic Officer. Following Barnwell's interim service, the Academic Officer position was divided into two Instructional Improvement Officer ("IIO") positions and filled by Tom Delinski and Revonda Johnson, both of whom are Caucasian. Renee McKinnon, an African American, was subsequently hired for a third IIO position.

Davis was criminally charged on April 23, 2010. The Board's Attorney, Beth Jensen ("Jensen") met with the State's Attorney's Office in May 2010, reviewed the evidence supporting the charges, and received an explanation of the case against Davis. Jensen then

---

[2] Although the paid leave was expected to be relatively short, it stretched into the full 2009-10 school year. During this time, Davis received her full salary of $110,000.

reported this information to the interim Superintendent, Norm Durflinger ("Durflinger"), who is Caucasian, and also to the Board. Durflinger recommended that the Board seek Davis' dismissal.

On June 7, 2010, the Board adopted a Resolution seeking to dismiss Davis' employment based on non-remediable defects in her conduct. A Notice of Charges and Bill of Particulars were attached to the Resolution and outlined the charges against her, including that she had committed theft against the District in the amount of $467.75 by using District funds to purchase a Mont Blanc pen for her personal use. The parties agreed to a hearing officer pursuant to Davis' request for an administrative hearing. Davis then filed a Motion and Memorandum "Requesting a Summary Decision from the Hearing Officer" alleging denial of an adequate pre-deprivation hearing prior to dismissal. On September 16, 2010, the hearing officer denied Davis' motion, finding that the September 8, 2009, meeting with Hinton adequately provided notice of the information concerning the District's action and an opportunity to respond, as required by the Due Process Clause.

On December 3, 2010, Davis filed her Charge of Discrimination alleging discharge from employment based on race, retaliation, and age. Her charge was dismissed, and she filed the present Complaint. Shortly thereafter, Davis pled guilty to a negotiated charge of attempted obstruction of justice, a Class A misdemeanor. Because this charge was a misdemeanor rather than a felony, Davis would be allowed to receive her state pension. During her colloquy with the presiding judge, Davis confirmed that she was pleading guilty to allegations that she attempted to obstruct justice when, with the intent to prevent her own prosecution, she knowingly furnished false information to Detective Kenser as to her use of Lindbergh funds. Davis confirmed that she understood the nature of the charges against her, understood the facts alleged in the

Complaint, and was entering her plea of guilty because the facts were true and she was in fact guilty of the charges. She was sentenced to 24 months' probation and ordered to pay restitution in the amount of $15,000, $10,000 of which was to be paid to the District "for money that was reimbursed to [her] from District 150."

On July 23, 2012, the Board adopted a Resolution amending its earlier Resolution seeking Davis' dismissal. The Amended Resolution was based on Davis' guilty plea, and Davis was given a copy of the Amended Resolution, an Amended Notice of Charges, and an Amended Bill of Particulars. A two-day administrative hearing was held on August 21-22, 2012. During the hearing, Davis never claimed that she had been dismissed because of her race. On November 19, 2012, the hearing officer issued a Final Report and Decision finding insufficient cause to support Davis' discharge and ordering her reinstatement. The Board appealed. At no time did Davis allege racial discrimination on the part of the Board or join any of her federal claims.

On September 5, 2013, the Circuit Court reversed the hearing officers decision, concluding that it was clearly erroneous and against the manifest weight of the evidence and that just cause existed for Davis' dismissal. On September 16, 2013, Davis appealed to the Illinois Appellate Court. The Illinois Appellate Court issued an opinion affirming the Circuit Court on October 1, 2015. Davis' Petition for Leave to Appeal to the Illinois Supreme Court was denied on January 20, 2016.

### Standard of Review

A motion for summary judgment will be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A material fact is one that might affect the outcome of the suit. *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 598-99 (7th Cir. 2000). The moving party may meet its burden of showing

an absence of material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show there is a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 588. Any disputed issues of fact are resolved against the moving party. *GE v. Joiner*, 552 U.S. 136, 143 (1997). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp.*, 477 U.S. at 323. Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Id*. at 324. Where a proposed statement of fact is supported by the record and not adequately rebutted, a court will accept that statement as true for purposes of summary judgment; an adequate rebuttal requires a citation to specific support in the record. *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998). This Court must then determine whether there is a need for trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party. A*nderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

## Discussion

### *Res Judicata*

Defendant first argues that Davis' Complaint is barred by *res judicata*, citing *Abner v. Illinois Department of Transportation*, 674 F.3d 716, 719 (7th Cir. 2012), for the proposition that

the judgment of a state court's review of an administrative agency decision is entitled to the same preclusive effect that the judgment would be entitled to in the courts of that state. As the Circuit Court entered a final judgment on the merits of Davis' case, the District argues that she was required to either have joined her federal civil rights claims in that proceeding or be precluded from raising them now.

In Illinois, *res judicata* or claim preclusion requires three elements: (1) a final judgment on the merits rendered by a court of competent jurisdiction; (2) an identity of the causes of action; and (3) an identity of the parties or their privies. *Nowak v. St. Rita High School*, 757 N.E.2d 471, 477 (Ill. 2001). The second element is satisfied "if [claims] arise from a single group of operative facts, regardless of whether they assert different theories of relief." *Walczak v. Chicago Board of Education*, 739 F.3d 1013, 1016-17 (7th Cir. 2014), *citing River Park v. City of Highland Park*, 184 Ill.2d 290 (Ill. 1998). *Res judicata* operates as an absolute bar to claims that could properly have been raised in an earlier proceeding, as well as claims that were actually determined. *Henry v. Farmer City State Bank*, 808 F.2d 1228 (7th Cir. 1986); *Garcia v. Village of Mt. Prospect*, 360 F.3d 630, 634 (7th Cir. 2004). Illinois' preclusion doctrine also contains a rule against "splitting" a claim between multiple lawsuits, so that a plaintiff cannot seek relief for part of a claim in one action and for the remainder of a claim in another. *Brown v. City of Chicago*, 771 F.3d 413, 414-15 (7th Cir. 2014). Finally, in order for the state court judgment to be awarded preclusive effect, the party against whom that decision is being enforced must have had a full and fair opportunity to litigate the claim. *Kramer v. Chemical Construction Corp.*, 456 U.S. 461 (1982).

Davis agrees with this statement of the law, but disagrees that the doctrine should be applied to bar her claims in this case. Specifically, she claims that she did not have a full and

fair opportunity to litigate her discrimination claims in the just cause proceeding. Davis was terminated effective June 8, 2010. Her Title VII claims had to have been initiated within 90 days after receiving her notice of right to sue, and her Equal Protection claim must have been brought within two years from the date of her termination. The state court action was an appeal by the District from the decision of the hearing officer as to whether there was just cause for Davis' termination that was not initiated until December 27, 2012. Thus, by the time the District initiated the appeal, she argues that she would have been barred from raising these claims by the applicable statute of limitations.

This argument addresses why she brought this case when she did, and not whether her claims could or should have been merged into the state court action as defenses to the propriety of her discharge. Both her federal claims and the state court proceedings arose out of the same transaction, namely the series of events ending with Davis' termination. *Abner*, 674 F.3d at 720. In a procedurally similar case, the Seventh Circuit found that the claim that an employer fired the employee in retaliation for a prior charge of race discrimination "is, in essence, an assertion that the [employer's] stated reason for his termination – disorderly conduct – is a pretext for discrimination. *Id.* As such, it could have been raised as a defense in the administrative proceeding." *Id.*, at 719. The failure to do so resulted in the preclusion of the claim being asserted under Title VII. *Id.*, at 719-20, *citing Welch v. Johnson*, 907 F.2d 714 (7th Cir. 1990); *Hayes v. City of Chicago*, 670 F.3d 810, 814-15 (7th Cir. 2012).

The same logic follows in this case. Essentially, Davis is arguing that the District terminated her not because of an alleged theft, but rather because of reverse racial discrimination. However, only one of these options can be factually accurate; either she was discharged because the District believed that she had committed misconduct with respect to the

student activity fund, or the District treated her differently because she was white. That being said, the propriety of her termination was litigated in state court and resolved in favor of the District, holding that the District had just cause for Davis' termination. This ruling necessarily establishes that the District had a legitimate, non-discriminatory ground for discharging Davis. *Id.*, at 720-22. And where nothing precluded the plaintiff from raising such a defense, the Seventh Circuit generally concludes that the plaintiff had a full and fair opportunity to litigated her claims. *Id.*

As an attempt to show that she could not have raised her claims in state court, Davis asserts that the hearing officer lacked jurisdiction to consider a claim of race discrimination, as his role was limited to determining whether the District had cause for her termination. However, the jurisdiction of the hearing officer does not address the jurisdiction of the circuit court in the administrative review process. Respectfully, it was established years before the facts giving rise to this case that Illinois courts have jurisdiction over federal civil-rights claims, and that "Illinois litigants seeking circuit-court review of administrative proceedings implicating events that also give rise to a federal civil-rights claim must join that claim with the judicial-review action in the circuit court." *Walczak*, 739 F.3d at 1017, *citing Blount v. Stroud*, 232 Ill.2d 302 (Ill. 2009); *Dookeran v. County of Cook*, 719 F.3d 570, 577 (7th Cir. 2013) (finding that "circuit courts have jurisdiction to hear federal civil-rights claims . . . and they may do so in tandem with judicial-review proceedings brought pursuant to statute or common-law writ of certiorari.") As such, it is clear that Davis could have joined her discrimination claims to the state court action for review of her discharge.

Finally, Davis contends that had she attempted to bring these claims as a counterclaim in the state court action, they would have been subject to dismissal under 735 ILCS 5/2-619

because "another action [was] pending between the same parties for the same cause." However, there is authority authorizing the stay of the federal action until the conclusion of the state court proceedings, followed by the dismissal of the federal action once the state proceedings have fully addressed all claims, and this Court would have been amenable to such a request. *See Simonsen v. Board of Education of City of Chicago*, 2002 WL 826477 (N.D.Ill. Apr. 29, 2002).

That being said, this Court was recently educated in an action against the same Defendant District raising the same defense that the final judgment in a state court suit challenging the school district's adverse employment action did not have res judicata effect precluding her federal action against the District for civil rights violations where the District constructively acquiesced to her claim "splitting" by waiting more than 18 months to raise res judicata as an affirmative defense. *Lawler v. Peoria School Dist. No. 150*, ___ F.3d ___, 2016 WL 4939538, at *4 (7th Cir. Sept. 16, 2016).

Here, Davis filed her Complaint on February 14, 2012. The District filed its Answer on March 19, 2012, with no mention of any objection to her splitting her claims between the state court review of the administrative proceedings and her federal case. The hearing officer issued his final report and decision on November 19, 2012. The proceeding in the Peoria County Circuit Court was initiated on December 27, 2012, and the ruling reversing the hearing officer to find in favor of the District was dated September 5, 2013. That ruling was appealed to the Illinois Appellate Court on September 16, 2013. The records of this case indicate that it was not until February 10, 2014, nearly two years after the case was filed, that the District first raised any objection to the simultaneous proceedings and asserted res judicata in its Motion for Summary Judgment. Under *Lawler*, this is sufficient to support a finding that the District acquiesced to the

claim splitting, and the Court finds that Davis' claims are not barred by res judicata as a matter of law.

### *Title VII: Reverse Race Discrimination*

Title VII prohibits employers from discriminating against employees on the basis of race, gender, and other protected characteristics. 42 U.S.C. §2000e-2(a)(1). A plaintiff in an employment discrimination case can avert summary judgment in two ways. She can present evidence showing discriminatory intent by the defendant or its agents, *see Troupe v. May Dept. Stores*, 20 F.3d 734, 736 (7th Cir. 1994), or she can pursue her claim under the burden shifting test established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and refined under its progeny. The basic inquiry under the direct method is whether a reasonable juror could conclude that plaintiff would not have been discharged if she had not been Caucasian, and everything else had remained the same. *Ortiz v. Werner Enterprises, Inc.*, 2016 WL 4411434 (7th Cir. Aug. 19, 2016).

To establish a *prima facie* case of discrimination under the *McDonnell Douglas* method, a plaintiff must establish that: (1) she was a member of a protected class; (2) she was qualified for the job in question or was meeting his employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) the employer treated similarly situated persons outside the protected class more favorably. Because this case presents a claim of reverse discrimination, the first and fourth elements of the *prima facie* case are different. As opposed to providing evidence demonstrating that she is a member of a protected class (the first element), Plaintiff must present "background circumstances" that "support an inference that the defendant is one of those unusual employers who discriminates against the majority." *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 455 (7th Cir.1999). As stated in *Mills*, other circuits have defined "background

circumstances" as "evidence indicating that there is something 'fishy' about the facts at hand." *Id.* Furthermore, as opposed to presenting evidence that similarly situated persons outside the protected class were treated more favorably (the fourth element), she must present evidence that similarly situated non-whites were treated more favorably. *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513-14 (7th Cir. 1993).

Under the *McDonnell Douglas* burden-shifting framework, if the plaintiff satisfies her initial burden of establishing a *prima facie* case, the burden shifts to the defendant to present a legitimate, nondiscriminatory reason for its decision. *Radentz v. Marion County*, 640 F.3d 754, 757 (7th Cir. 2011) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). If the defendant does so, the burden returns to the plaintiff to show that the defendant's explanation was pretextual. *Id.* If a reasonable fact-finder would be compelled to believe the defendant' explanation, then the defendants are entitled to summary judgment.

Under the first option, Davis must offer evidence sufficient to permit a reasonable factfinder to conclude that her race caused her discharge. *Ortiz*, 2016 WL 4411434 at *4. "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself . . . ." *Id.* Contrary to the District's argument, Davis does not simply rely on the fact that Hinton and other administrators were African American.

She points to employment decisions made with respect to Taunya Jenkins ("Jenkins"), Sharon Kherat ("Kherat"), and Renee Andrews ("Andrews"). Jenkins, an African American, was principal at Roosevelt School. In 2007, Jenkins organized a student field trip to Jamestown, Virginia. Board policy requested that a proposal and supporting documents be submitted prior to seeking approval of such trips, but this was not done for the Jamestown trip. The District received complaints that Jenkins had taken a relative on the trip, and that Jenkins collected

unspent money from the students when they returned; there is no indication as to why Jenkins collected this money or what happened to it after it was collected. Broderick investigated and found that the trip was not set up or managed well and was not fully funded. There were multiple questions about individuals getting free trips while others paid $850.00, and $500 was wired to Jenkins on the trip without any records documenting how that money was spent. Elijah Samson is not employed by the District but is a photographer for Caterpillar; there is nothing indicating why he went on the trip or did not pay for his spot on the trip. There were also minors on the trip who were not students at Roosevelt, including one of Jenkins' relatives; Broderick found no evidence that Jenkins' relative paid for the trip or that Jenkins paid for him. An audit report from Clifton Gunderson in August 2007 found that the trip was underfunded, with only $17,037.00 available to repay a $25,000.00 loan from the District. When questioned about these issues, Jenkins was uncooperative and responded that it was not their business. Although Hinton determined that Jenkins should be removed from her position at Roosevelt, the incident was not referred to the PPD, and she was not discharged but rather was reassigned to be an assistant principal at Manual High School. At Manual, Jenkins was assistant principal and Kherat was her principal. The District became aware of allegations that Kherat and Jenkins were on a cruise when they were supposed to be working in violation of policy and were submitting false grades. There is no indication of what happened to Kherat at the time, but she ultimately went on to become the District Superintendent, and Jenkins later became the principal at Manual.

      Davis also points to Andrews, an African American who was the principal at Whittier School. The District became aware that Andrews hired her mother as bookkeeper for the after school program and paid her from the student activity fund. Broderick investigated and determined that the other schools were not employing family members and were not paying

anyone to do that task. He advised that it was improper for Andrews to pay her family member and that the District was paying more for bookkeeping services than was being paid in other after school programs and suggested that it be stopped. Andrews did not follow his advice.

Of these situations, when construed in the light most favorable to Davis as the non-movant, Jenkins' conduct as a principal in connection with the Jamestown trip is comparable to Davis' misconduct as a principal[3] in that her taking a minor relative on the trip without paying for him (at a cost of $850.00 to the district) and unaccounted for use of school funds ($500 wire transfer) could be found by a reasonable juror to be equivalent to theft and have resulted in personal benefit to Jenkins in an amount significantly higher than the $467.75 pen Davis purchased. Like Davis, Jenkins' conduct was investigated. However, instead of cooperating and offering documentation and explanation, Jenkins responded that it was none of their business, effectively impeding the investigation. Like Davis, the misconduct was indicative of potential criminality and was reported to Hinton and ultimately the Board. Yet for some reason, Hinton didn't call the police to investigate as was the District's standard practice, and Jenkins was allowed to continue her employment in another leadership position with the District.

While the District argues that it did not terminate Davis until after she was criminally charged and pled guilty, the fact that Jenkins' misconduct, involving a substantial amount of student activity funds, missing financial documentation, and refusal to cooperate in the investigation, was not even reported to the police essentially prevented her situation from

---

[3] The District's suggestion that any comparator must be similar to Davis in her position as Academic Officer is self-serving and misplaced, as she was clearly disciplined based on her conduct as a principal with authority over the student activity fund, which is precisely the same position occupied by Jenkins at this time of her alleged misconduct. The fact that Davis had been promoted to another position by the time her conduct was discovered while Jenkins' conduct came to light while she was still principal does not change the fact that they held the same positions at the time of the challenged conduct.

following the same course as Davis' situation.[4]  This promotes the reasonable inference that Davis was punished for conduct that was tolerated when committed by an African American principal.  When disputes of fact are construed in Davis' favor and considered in conjunction with the record as a whole, this disparate enforcement of District policy is "something fishy" from which a reasonable juror could conclude that the District is "one of those unusual employers who discriminates against the majority" by looking the other direction when presented with evidence of potential criminal misconduct by African American employees. *See Olsen v. Marshall & Ilsey Corp.*, 267 F.3d 597, 601 (7th Cir. 2001) (finding that the selective enforcement of a rule or policy calls into question the veracity of the employer's explanation.)  On the record before the Court, a reasonable jury could conclude that Davis would have kept her job with the District had she been African American.

While the District certainly has non-discriminatory explanations for the differential treatment, the ultimate determination will require assessments of credibility and a determination of fact that are inappropriate at summary judgment.  Having found that Davis has raised a genuine issue of material fact as to whether she was the victim of reverse racial discrimination, the Court need not analyze her ability to survive under the *McDonnell Douglas* burden-shifting method.  The Motion for Summary Judgment is denied, and the Davis' Title VII claim will proceed to jury trial.

---

[4]  The District argues that Davis' plea is dispositive with respect to any suggestion of disparate treatment.  However, the Court is concerned with what happened before the criminal charges were filed.  It would defy common sense to suggest that an employee who made no attempt to hide her conduct and cooperated in the investigation of potential criminal conduct must be reported to the police as per policy, while another employee who was deceptive and obstructive in her conduct and adamantly refused to answer questions or cooperate in the investigation of potential criminal conduct need not be reported as per policy.  But for this differential treatment, it is only speculation that the outcome would not have been the same.  Yet for some reason, Jenkins' conduct with respect to the student activity fund was tolerated while Davis' conduct was not; Davis is entitled to have a jury determine what that reason actually was.

*Equal Protection Claim*

Davis further contends that she suffered racial discrimination in violation of the Equal Protection clause based on the same facts. Where an employee brings parallel constitutional claims and Title VII based on racial discrimination, "the same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection claims." *Hildebrant v. Illinois Dept. of Natural Resources*, 347 F.3d 1014, 1036 (7th Cir. 2003), *citing Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003); *Huri v. Office of the Chief Judge of the Circuit Court of Cook County*, 804 F.3d 826, 835 (7th Cir. 2015) (recognizing that "[w]hen a plaintiff uses § 1983 as a parallel remedy to a Title VII . . . claim, the *prima facie* elements to establish liability are the same under both statutes." Stating a Title VII disparate treatment claim also establishes a viable claim to § 1983 relief. *Id.* Summary judgment is therefore denied on Davis' equal protection claim, as it requires resolution by a jury.

## Conclusion

For the reasons set forth above, Defendant's Motion for Summary Judgment [18] is DENIED. Plaintiff's retaliation and procedural due process claims (Counts II, V, and IV) are WITHDRAWN. Plaintiff's racial discrimination claims under Title VII and § 1983 (Counts I and III) remain for trial by jury. This matter is now ready for final pretrial conference.

ENTERED this 29th day of September, 2016.

s/ James E. Shadid
James E. Shadid
Chief United States District Judge